SEYMOUR SILVERMAN, Et Al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Silverman v. Commissioner
Docket Nos. 3707-72, 3708-72, 3709-72, 3710-72.
United States Tax Court
T.C. Memo 1974-285; 1974 Tax Ct. Memo LEXIS 35; 33 T.C.M. (CCH) 1321; T.C.M. (RIA) 740285; November 6, 1974, Filed. Sidney Gelfand and Wallace Musoff, for the petitioners. Stanley. J. Goldberg, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: The respondent determined deficiencies in gift tax to be due from petitioners for the calendar year 1968, as follows: Docket No.
Petitioner
Deficiency
3707-72
Seymour Silverman
$ 116,902.50
3708-72
Helen Silverman
116,902.50
3709-72
Jack Silverman
259,087.20
3710-72
Frances Silverman
259,087.20
Total
$ 751,979.40
*36 The sole issue for decision relates to the determination of the value, within the meaning of section 2512, [2] of the shares of class B common stock of Modern Maid Food Products, Inc., on August 21, 1968 and September 24, 1968, the dates when petitioners made gifts of the stock to certain trusts. FINDINGS OF FACT Some of the facts have been stipulated by the parties. Such facts and the exhibits attached thereto are incorporated herein by this reference. Seymour Silverman and Helen Silverman are husband and wife. At the time of the filing of their petitions herein, they legally resided at Lynnbrook, New York. Seymour Silverman filed a U.S. Gift Tax return for the calendar year 1968 with the district director of internal revenue, Brooklyn, New York. Mrs. Helen Silverman consented to have the gifts made during the calendar year 1968 considered as having been made one-half by her and the other half by her spouse. Jack Silverman and Frances Silverman are husband and wife. At the time of the filing of their petitions herein, they legally resided at Woodmere, *37 New York. Jack Silverman filed a U.S. Gift Tax return for the calendar year 1968 with the district director of internal revenue, Brooklyn, New York. Mrs. Frances Silverman consented to have the gifts made during the calendar year 1968 considered as having been made one-half by her and the other half by her spouse. Modern Maid Food Products, Inc. (hereinafter referred to as "Modern Maid"), was organized on January 7, 1952, under the laws of the State of New York and has engaged in the business of manufacturing and selling breading and batter mixes for use by processors of shrimp, fish, and poultry, and the manufacturing and selling of prepared flour mixes for mass feeding outlets such as hospitals, restaurants, and hotels. The flour mixes are sold through wholesale grocers. Modern Maid is a successor to a partnership formed in 1933. Modern Maid has two wholly-owned subsidiaries, Modern Maid Food Products of Louisiana, Inc., and Modern Maid Realty Corp., both incorporated under the laws of the State of Louisiana. The principal executive offices of Modern Maid were located at 110-60 Dunkirk Street, Jamaica, New York. On April 22, 1968, the capitalization of Modern Maid, *38 and the shares held by the respective shareholders, were as follows: Common Stock $ 100 Preferred Stock $ 100
Par Value
Par Value
Jack Silverman
1,284
265
Seymour Silverman
645
430
Harold Oppenheim
225
150
Stanley Silverman
3
10
Joel Silverman
3
10
Jack Silverman Foundation
575
Total
2,160
1,440
On April 22, 1968, Modern Maid Food Products, Inc., requested a ruling from the Commissioner of Internal Revenue that a proposed reorganization qualify as a tax-free reorganization under the provisions of section 368(a) (1) (E). Under the proposed reorganization, Modern Maid would increase authorized preferred stock $ 100 par value from 1,500 to 30,000 shares and create two new classes of stock, namely (a) 24,000 shares of voting class A common stock par value $ 10 per share and (b) 96,000 shares of nonvoting class B common stock par value $ 10 per share. Each share of the original common stock would thereupon be exchanged for 10 shares new class A common par value $ 10 per share, 40 shares new class B common par value $ 10 per share, and 11 shares preferred par value $ 100 per share. On June 28, 1968, the Commissioner of Internal Revenue *39 issued his ruling with respect to Modern Maid's request of April 22, 1968. On July 13, 1968, Modern Maid voted to adopt the proposed plan of reorganization, effective August 12, 1968. As a result of the reorganization, the outstanding capital stock of Modern Maid Food Products, Inc., was held as follows: Class A Common Class B Common
5% Common Preferred
$ 10 par value
$ 10 par value
Stock $ 100 par
value
Jack Silverman
12,840
51,360
14,389
Seymour Silverman
6,450
25,800
7,525
Harold Oppenheim
2,250
9,000
2,625
Stanley Silverman
30
120
43
Joel Silverman
30
120
43
Jack Silverman Foundation
575
21,600
86,400
25,200
On August 12, 1968, Modern Maid entered into an agreement for the sale of unissued class B common stock to selected employees and legal counsel. The said agreement concerned purchases for investment purposes only and prohibited the subscribing stockholders from disposing of or encumbering their class B stock without the consent of the corporation. In absence of such consent or on the retirement or death of the subscribing stockholder, the agreement provided: * * * The party [the subscribing stockholder *40 or his estate] * * * shall give to the Corporation written notice by certified mail of his intention, and such notice shall contain an offer to sell all his stock in accordance with the terms of this agreement, within thirty (30) days after the date of such notice, the stockholder giving such notice shall sell and the Corporation shall purchase all of such stockholder's stock. The purchase price of each share was to be based on the value shown on the last Federal income tax return or on the annual financial statement, if such information was not on the return. The parties themselves could set any other value by agreement. Pursuant to this agreement, Modern Maid, in September 1968, sold 4,790 shares of its class B common stock to said employees and associates at $ 10 per share. Gifts of class B common stock were made by Jack Silverman, Seymour Silverman and Harold Oppenheim on the dates and in the amounts set forth below: Date
Donor
Donee
No. of Shares
8/21/68
Jack Silverman
Trust for Benefit of Joel Silverman
25,680
Trust for Benefit of Stanley Silverman
25,680
Total
51,360
9/24/68
Seymour Silverman
Trust for Benefit of Susan Silverman
8,600
Trust for Benefit of Anne Silverman
8,600
Trust for Benefit of Beth Silverman
8,600
Total
25,800
12/8/68
Harold Oppenheim
Martin Oppenheim
2,000
Sandra Oppenheim
2,000
Trust for Benefit of Elysia Beth Oppenheim
2,000
Trust for Benefit of Robert Alan Oppenheim
2,000
Total
8,000
*41 On December 31, 1968, the following positions were held by the persons listed below: Name Jack Silverman
President and Director
Harold Oppenheim
Vice President and Director
Seymour Silverman
Secretary-Treasurer and Director
Stanley Silverman
Director
Jack Silverman, then 60 years of age, one of the founders of Modern Maid, had been its chief executive since 1957. Harold Oppenheim, then 54 years of age, had been employed by Modern Maid since 1954. Between 1954 and 1968, he served as superintendent in charge of plant operations and since 1968 had served as vice president in charge of plant operations. Seymour Silverman, then 49 years of age, had been employed by Modern Maid since 1952 and had served as secretary-treasurer since that time. Stanley Silverman, then 26 years of age, had been employed by Modern Maid continuously since 1967. Beginning in March 1969, negotiations were initiated on behalf of Modern Maid with Ladenburg, Thalmann & Co., investment bankers, with a view towards the sale of stock of Modern Maid in a public offering. A special meeting of the stockholders was called on June 16, 1969, to amend the certificate of incorporation of *42 Modern Maid, and to take such other actions as were necessary in order to meet the conditions prescribed in the agreement with Ladenburg, Thalmann & Co. for a public offering of the common stock of Modern Maid. At this meeting of June 16, 1969, an amendment to the certificate of incorporation was adopted authorizing a capitalization consisting of 2 million shares of common stock of a par value of $ 1 per share with voting rights, and 100,000 shares of convertible preferred stock with such designations, relative rights, preferences and limitations, as might be set by the board of directors; a further amendment was adopted to provide that no shareholder shall have preemptive rights; and the permissible number of directors was increased to not less than three and not more than nine. A plan of reorganization was thereupon adopted whereby each share of then issued and outstanding preferred stock would be exchanged for 8.75 shares of the new common stock, each share of presently issued and outstanding class A voting stock would be exchanged for 7 shares of the new common stock, and each share of the presently issued and outstanding class B voting stock would be exchanged for 6.5 shares *43 of the new common stock. At the same meeting, the proposal by Ladenburg, Thalmann & Co. for the underwriting and public sales of the shares of Modern Maid was approved and the appropriate authorizations to the offices and directors to proceed therewith were adopted. Following the meeting of the stockholders on June 16, 1969, the exchange of the then outstanding class A common stock, class B common stock, and preferred stock was consummated in accordance with the plan adopted at the meeting. On October 28, 1969, Ladenburg, Thalmann & Co. issued its prospectus whereby it made a firm commitment to underwrite and publicly sell 350,000 shares of the new common stock at $ 12 per share. It acquired 100,000 shares from the company and 250,000 from certain selling shareholders. The Consolidated Balance Sheet of Modern Maid and its subsidiaries as of December 31, 1967, was as follows: ASSETS CURRENT
Cash
$ 497,715
Accounts & Notes Receivable
2,656,444
Inventories
415,458
Certificate of Deposit
150,000
Interest Receivable
4,029
$ 3,723,646
FIXED ASSETS
Machinery & Equipment
1,636,987
Furniture & Fixtures
87,927
Leasehold Improvements
220,959
Land & Building
343,358
Truck Trailer
24,842
2,314,074
Less: Reserve for Depreciation
1,039,470
1,274,604
OTHER ASSETS
Deposits & Advances
54,027
Investments
26,000
Life Insurance - Cash Surrender Value
32,703
Deferred Charges
13,415
Net Leasehold
3,950
130,095
$ 5,128,345
LIABILITIES & CAPITAL
CURRENT
Accounts Payable
744,138
Taxes Withheld
25,036
Accrued Expenses
237,496
Federal Income Taxes
211,999
Due to Officers
21,901
Notes Payable
36,455
$ 1,277,025
NET WORTH
Common Stock
216,000
Preferred Stock
144,000
Surplus
3,491,320
3,851,320
$ 5,128,345
*44 The Consolidated Statement of Operations of Modern Maid and subsidiaries for the period December 31, 1964 to 1968, inclusive, and the 6-month period ended June 30, 1968 and June 30, 1969, was as follows: [3]
Year, December 31,
1964
1965
1966
Net Sales
$ 8,255,805
$ 9,771,555
$ 10,673,769
Cost of sales (Note B)
5,291,198
6,291,795
7,162,996
Gross Profit
2,964,607
3,479,760
3,510,773
Selling, general and administrative
2,105,095
2,300,100
2,413,066
expenses (Notes A and B) Income from operations
859,512
1,179,660
1,097,707
Other Income (deductions): Interest
11,977
23,382
39,247
Income
Other, net
(15,378)
(7,958)
(9,583)
(3,401)
15,424
29,664
Income before provision for income taxes
856,111
1,195,084
1,127,371
Provision for Income Taxes: Federal
393,483
522,567
479,362
State and City
36,881
50,035
58,786
430,364
572,602
538,148
Net Income
$ 425,747
$ 622,482
$ 589,223
Year, December 31,
Six Months Ended June 30,
1967
1968
1968
1969
Net Sales
$ 11,739,411
$ 13,478,372
$ 6,290,394
$ 7,046,273
Cost of sales (Note B)
7,709,696
8,743,482
4,076,175
4,493,504
Gross Profit
4,029,715
4,734,890
2,214,219
2,552,769
Selling, general and 2,788,565
3,088,817
1,451,081
1,620,274
administrative expenses (Notes A and B)
Income from operations
1,241,150
1,646,073
763,138
932,495
Other Income (deductions)
44,854
56,928
33,610
30,536
: Interest Income
Other, net
(1,610)
(124)
--
(1,971)
43,244
56,804
33,610
28,565
Income before provision
1,284,394
1,702,877
796,748
961,060
for income taxes
Provision for Income 558,575
817,750
374,713
477,558
Taxes: Federal
State and City
90,158
96,878
41,949
52,807
648,733
914,628
416,662
530,365
Net Income
$ 635,661
$ 788,249
$ 380,086
$ 430,695
*45 After the 1968 recapitalization of Modern Maid, the earnings per share of the common stock based on the consolidated income for the taxable years 1964 to 1968, inclusive, were as follows: Shares
1964
1965
1966
1967
1968
Outstanding
Net Income
$ 425,747
$ 622,482
$ 589,223
$ 635,661
$ 788,249
Preferred Stock
25,200
126,000
126,000
126,000
126,000
126,000
5% cum. pref.
Class A common
21,600
Class B common
91,190
Earnings for
112,790
299,747
496,482
463,223
509,661
662,249
common shares
Earnings per 2.66
4.40
4.11
4.52
5.87
common shares
Modern Maid was engaged in the business of manufacturing and selling breading and batter mixes for use by processors of shrimp, fish and poultry, and the manufacturing and selling of prepared flour mixes for mass feeding outlets such as hospitals, restaurants and hotels. The flour mixes are sold through wholesale grocers. Modern Maid Food Products, Inc. is a successor to a partnership formed in 1933. It had a long history of steady earnings and growth. Modern Maid's three major competitors with regard to its breading and batter mix products were Newlywed Baking Co. *46 of Chicago, DCA Food Industries (formerly Donut Corporation of America), and Griffith Laboratories of Toronto, Canada. Its chief competitors in the prepared flour mix field were Pillsbury Flour Mills, General Mills, and DCA Food Industries. There were no public sales of the common stock of Modern Maid prior to the underwriting by Ladenburg, Thalmann & Co., referred to above. No evidence was presented to show any public or other sales of stock in any company which might be considered comparable to Modern Maid. A multiple of ten times average earnings was a reasonable basis for the valuation of the class A common stock of Modern Maid. As of August 21, 1968, and as of September 24, 1968, the fair market value of the class A common stock of Modern Maid was not less than $ 40 per share. As of the same date, the fair market value of the class B common stock was not less than $ 25 per share. OPINION The sole issue presented in this case relates to the value for gift tax purposes of several gifts of class B common stock of Modern Maid, totaling 77,160 shares. The procedures for the valuation *47 of such property are set forth in sections 25.2512-1 and 25.2512-2, Gift Tax Regs. Since there were no public sales of the stock in question, the parties have resorted to other factors in accordance with those regulations. The petitioners had absolute control of Modern Maid. They proceeded to effect a plan of reorganization or recapitalization for the purpose of making a gift of an interest in the corporation to their children, at the same time affording an opportunity to selected employees and associates in the business to buy some stock in the corporation. Pursuant to a plan of recapitalization effected August 12, 1968, the then outstanding 2,160 shares of common stock par value $ 100 per share were exchanged for 10 shares of class A common stock with a par value of $ 10 per share, 40 shares of class B common stock with a par value of $ 10 per share, and 11 shares of preferred stock with a par value of $ 100 per share. Simultaneously, by agreement dated August 12, 1968, Modern Maid issued 4,790 additional shares of class B common stock to selected employees and legal counsel for a price of $ 10 per share. Following these transactions, Modern Maid had outstanding 21,600 shares *48 of class A common stock, 91,190 shares of class B common stock and 25,200 shares of preferred stock. As a result of the recapitalization, Jack Silverman held 12,840 shares of class A common stock, 51,360 shares of class B common stock and 14,389 shares of preferred stock. On August 21, 1968, he made gifts in trust for the benefit of his children totaling 51,360 shares of class B common stock.
As a result of the recapitalization, Seymour Silverman held 6,450 shares of class A common stock, 25,800 shares of class B common stock, and 7,525 shares of preferred stock. On September 24, 1968, he made gifts in trust for the benefit of his children totaling the 25,800 shares of class B common stock. For gift tax purposes, the petitioners reported a valuation of $ 10 per share for the class B common stock. In his notice of deficiency, respondent determined that the stock had a value of $ 48 per share. In his brief, respondent contends for a value of $ 25 per share. In their brief, petitioners argue that the valuation of $ 10 per share was too high, claiming a value of not more than $ 5 per share. In this proceeding, the Court is not called upon to consider the tax consequences of the *49 reclassification of the class B nonvoting shares into voting shares and the public offering of such shares. Until such event took place, all that the donees received was a nonvoting interest in a family-controlled corporation. However, we cannot ignore the realities of the situation. The occasion for the subsequent exchange of the nonvoting stock for voting stock, in order that an interest in the corporation could be sold to the public, may not have been foreseen at the time of the recapitalization and gifts. This does not mean that a second step in the "giving process" was not contemplated at some future date, irrespective of that occasion. [4] If all petitioners had in mind was to make a gift of nonvoting common stock to their children, the parties probably would not be before this Court. The fact that the offer of the shares to the employees and associates at $ 10 per share was coupled with the restrictions on the sale of such shares under certain conditions at book value further confirms that none of the transactions involved in this proceeding can be measured as one would an arm's length sale such as would be made to a stranger. *50 The basis upon which petitioners would value the class B common stock is concisely stated in a hypothetical question proposed in petitioners' reply brief as follows: * * * "How much would I invest to acquire 25,680 shares of Class B nonvoting, nondividend paying stock of Modern Maid Food Products, Inc. in August 1968 knowing the earning history and book value up to December 31, 1967, knowing those controlling the business had no plan or intention of going public, knowing that the substantial salaries and preferred dividends vitiated any incentive to declare dividends on the common stock, and knowing that the management intended to leave control to their children?" Nothing in this record would support the hypothesis that "those controlling the business had no plan or intention of going public," nor can we attribute to petitioners, who controlled the voting stock, an intent to refrain from declaring dividends, increasing their salaries at will, and otherwise acting to the detriment of the nonvoting stockholders. On the contrary, petitioners were in a quasi-fiduciary relationship to the *51 holders of the minority or nonvoting interests. [5] As such, they would be required to act in good faith as far as the rights of the minority are concerned. Pepper v. Litton, 308 U.S. 295 (1939); Zahn v. Transamerica Corporation, 162 F.2d 36 (C.A. 3, 1947). If that duty were breached, the minority shareholders could maintain a cause of action to prevent or redress any injuries. Doherty v. Mutual Warehouse Company, 245 F.2d 609 (C.A. 5, 1957).[6] The only statement with which we are in agreement is that the intent of petitioners was to leave control of the corporation to their children. We are really being asked to look at the first step in the fulfillment of that intent. The expert testimony presented by petitioners with respect to the value *52 of the class B common stock failed to take into account the fact that if petitioners intended to sell a substantial interest in Modern Maid - and the class B common stock represented approximately two-thirds of the equity after the preferred stock - they would have adopted a different course of action or there never would be a sale. Although Ladenburg, Thalmann & Co. was unquestionably the best qualified "expert" to express an opinion with respect to the value of the stock of Modern Maid, petitioners chose not to present the testimony of that firm. An expert witness for respondent testified that the stock, giving consideration to its restricted character, had a fair market value as of the date of the gifts of $ 25 per share. His opinion is supported by a valuation for the common stock, as a whole, discounted for the lack of voting power and control. However, rather than look to opinion evidence with respect to the value of the class B common stock from an "outsider," the Court would be inclined to give greater weight to the relative value of the class B common stock which the petitioners, who still had control of the corporation, attributed to that stock in the ensuing transaction *53 whereby both classes of stock were exchanged for a single class of voting common stock. At the time of the gifts, there were outstanding 21,600 shares of class A common stock and 86,400 shares of class B common stock. Contemporaneously therewith, an additional 4,790 shares of class B common stock were sold to selected employees and associates, making a total of 91,190 shares of class B common stock outstanding. A few months later, petitioners approved the terms of a second reorganization whereby the class A common stock would receive 7 shares of a new common stock and the class B common stock would receive 6.5 shares of a new common stock, thereby attributing to the class B common stock a value equal to 65/70ths of the value of the class A common stock. As a result, the holders of 21,600 shares of class A common stock acquired 151,200 shares of the new common stock and the holders of 91,190 shares of class B common stock acquired 592,735 shares of the new common stock. In this proceeding, neither party has directly challenged the basis for the exchange. In fact, petitioners' main objection was that the value attributed to either class of stock, as of the date of the agreement *54 with Ladenburg, Thalmann & Co., should not be taken as evidence of value on the dates of the gifts. Irrespective of the value attributed to the new common stock by Ladenburg, Thalmann & Co. in connection with a public offering, the fact that the old class B common stock was given a parity of 6.5 to 7 with the old class A common stock provides a yardstick with which to measure the value of the former as of the dates of the gifts. At that time, the Court would find that the class A common stock had a fair market value of about $ 40 per share. Using the subsequent exchange as a basis, this would result in a fair market value of $ 37 per share for the class B common stock. Accordingly, considering the record before us, the Court finds that the fair market value of the class B common stock of Modern Maid, as of August 21, 1968 and as of September 24, 1968, was not less than $ 25 per share. Decisions will be entered under Rule 155. Footnotes
1. The cases of the following petitioners are consolidated herewith: Helen Silverman, docket No. 3708-72; Jack Silverman, docket No. 3709-72; and Frances Silverman, docket No. 3710-72. ↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
3. The financial data for the taxable years ended December 31, 1964 and 1965 and for the 6-month period ended June 30, 1968, are unaudited. ↩
4. Petitioners offered proof that the transaction with Ladenburg, Thalmann & Co., which brought about the conversion of the class B nonvoting common stock, was not foreseen at the time of the gifts. This does not negate the respondent's claim that petitioner's future plans went beyond the first step, with which we are here concerned. ↩
5. The only point on which the expert witnesses seemingly agreed was that the nonvoting stock should be treated the same as a minority interest in a closely-held corporation. ↩
6. For a discussion with respect to the liability of the directors for failure to declare dividends, see Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, P 8.02, p. 8-6 (3d Edition, 1971). ↩